# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    *Plaintiff*,

vs.

ERNESTO HERNANDEZ-LIZARDI and
RAUL MANZANAREZ-RIVERA,

    *Defendants.*

Case No.10-10136-01-02-EFM

## MEMORANDUM AND ORDER

Presently before the Court is Defendant Ernesto Hernandez-Lizardi's motion to suppress (Doc. 30), Defendant Raul Manzanarez-Rivera's motion to supress (Doc. 35), and Defendant Hernandez-Lizardi's motion to join Defendant Manzanarez-Rivera's motion to suppress (Doc. 37). A hearing on Defendants' motions was held on January 11, 2011. For the reasons stated below, the Court denies Defendants' motions to suppress.[1]

## BACKGROUND

Approximately twelve miles west of Hays, at 10:06 p.m. on August 15, 2010, Trooper Shawn Summers of the Kansas Highway Patrol pulled over a westbound, 2003 Chevy Silverado extended cab for driving 83 miles per hour ("mph") in a 70 mph zone. Upon reaching the vehicle, which had a Missouri dealer's tag, Trooper Summers asked the driver, Defendant Hernandez-Lizardi, for his

---

[1]The Court grants Defendant Hernandez-Lizardi's motion to join Defendant Manzanarez-Rivera's motion to suppress.

license and proof of insurance, and the passenger, Defendant Manzanarez-Rivera, for his identification. Trooper Summers noticed that there were three cell phones on the center console. As the parties attempted to locate the requested documents, Trooper Summers began asking them questions concerning where they were from, where they were headed, their reasons for travel, and future travel plans. Defendant Hernandez, with a heavy accent, stated that he was from California, that he had been in Kansas City visiting friends, that he and Manzanarez-Rivera were headed to Denver to help a friend fix a car, and that once the car was fixed he was going to drive Manzanarez-Rivera back to Kansas City and then drive back home to California. While Trooper Summers and Defendant Hernandez-Lizardi were conversing, Defendant Manzanarez-Rivera stared straight ahead, which Trooper Summers found to be unusual because in his experience the passenger usually talks to the driver or him during the stop. At some point, both occupants handed Trooper Summers their identification – Hernandez-Lizardi a California driver's license and Manzanarez-Rivera a Mexican identification card. Hernandez-Lizardi was unable to provide proof of insurance for the vehicle, but he did produce a bill of sale, which, among things, stated that Lizardi had bought the pickup a couple of weeks earlier for $1000 and that Lizardi lived on Prospect Street in Kansas City, a street Summers, based on his training and experience, believed to be home to much criminal activity. Curiously, the bill's box asking for title information was left blank. Approximately two and a half minutes after initiating contact with the vehicle's occupants, Trooper Summers returned to his cruiser to run various checks on the information he had been provided and write the driver a speeding ticket.

A little over seven minutes later, Summers returned to the car once again, handing back the documents he had received and explaining the ticket to the driver. After completing these tasks,

Summers told the occupants to have a safe trip and started back toward his car. However, within just a few seconds, Trooper Summers returned to the driver's window, stated that he had a few more questions, and asked the occupants if there was anything illegal in the vehicle, such as drugs, weapons, or large amounts of cash. The occupants stated that the vehicle did not contain any thing illegal, and Trooper Summers asked if he could take a quick look, which the driver said that he could. Trooper Summers then asked the occupants to step out of the vehicle and go stand in front of it. As Trooper Summers was about to conduct his search, Defendant Hernandez-Lizardi stated that he did have cash. After making this announcement, Lizardi got back into the pickup to retrieve the cash for Trooper Summers. As he was doing this, Summers asked Lizardi how much cash there was and why he did not tell him about it earlier. Lizardi stated that there was 20, 25,000, maybe 23,000 dollars, and that he had forgotten about it. Once Lizardi emerged from the pickup, he handed Summers a jean purse, which contained a large amount of cash wrapped up with different colored rubber bands. Summers called for backup and then continued questioning the occupants about the cash.

About three minutes after Summers made his call for backup, two more troopers arrived on the scene. One of the troopers recommended that Summers phone Trooper Doug Rule, who is assigned to the DEA task force in Garden City, Kansas, to ask what to do, which Summers did. Rule stated that Summers should bring the vehicle and occupants to the trooper station in Hays so that he could talk to them. After getting off the phone with Rule, Summers returned to the pickup and told the driver to follow him because there is someone who wants to talk about the money. He further added that he was going to keep the money with him and that they would be free to go once

they spoke to Trooper Rule. A little over twenty-three minutes after the stop was effectuated, Summers and Defendants were en route to Hays.[2]

Approximately ten to fifteen minutes later, Summers and Defendants arrived at the trooper station in Hays, where they were greeted by Trooper Rule, who was dressed in blue jeans and a t-shirt. Rule took Defendant Hernandez-Lizardi into an office and spoke to him for about fifteen to twenty minutes, during which time Lizardi admitted that he was in this country illegally. Rule next spoke to Manzanarez-Rivera for a few minutes, who also admitted that he was in this country illegally. Before talking to either defendant, Rule told them that they were not under arrest and that they were free to leave.

While Rule was speaking to Defendants, Trooper Summers searched the pickup and discovered ammunition. After Rule had completed his questioning of Defendants, Summers told Rule about his discovery, and both troopers went out and performed a more thorough search of the pickup, which resulted in the discovery of an SKS assault rifle, 380 pistol, and a .45 caliber handgun. At some point, a canine unit performed a canine sniff of the vehicle. No drugs were found, however the canine did alert following a sniff of the cash. Due to the discovery of the firearms and ammunition, both defendants were arrested and indicted with one count of illegal alien in possession of ammunition and one count of illegal alien in possession of a firearm.

## ANALYSIS

Both of the defendants ask this Court to suppress the evidence against them on the ground that it was acquired in violation of the Fourth Amendment. In their briefing, Defendants concede that the initial stop was lawful, however, they argue that the following actions were unlawful: (1)

---

[2]Summers was in front of Defendant Lizardi's pickup and one of the other troopers was behind it.

Summers' questioning before returning to his cruiser to write Defendant Hernandez-Lizardi a speeding ticket, (2) Summers' continued questioning after giving the defendants their documents back, (3) Summers' quick search on the roadside, (4) the transportation of the defendants to the trooper station for additional questioning,(5) the searches of the vehicle while at the trooper station, and (6) the questioning by Trooper Rule.

Before addressing the merits of Defendants' arguments, the Court will discuss briefly the issue of standing. In its initial briefing, the Government argued that both of the defendants lacked standing to challenge the searches of the pickup because neither could show that they had a legitimate interest in or lawful control over the vehicle in question,[3] which is required under existing Tenth Circuit law.[4] However, at the conclusion of the hearing, based on Trooper Rule's testimony relating to Defendant Lizardi's payments on the pickup, the Government withdrew its standing objection as to Defendant Lizardi, but not to Defendant Rivera. Because the Government did not withdraw its objection to his client's standing, Defendant Rivera's counsel's requested that the Court reserve its ruling on the matter and allow him to file supplemental authority in support of his position that a passenger with no ownership or possessory interest in a vehicle has standing to challenge a search, which it did. In a letter submitted to Court on January 14, 2011, counsel argued that *Brendlin v. California*, 551 U.S. 249 (2007), supports his position. The Court disagrees. *Brendlin* did nothing to this Circuit's long-standing rule that in order for a defendant to have standing to challenge a search, he must show that there is a factual nexus between his allegedly

---

[3]The Government correctly did not argue that the defendants lacked standing to challenge their own seizure and the fruits that come from it. *See United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001).

[4]*See United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000).

illegal detention and the discovery of incriminating evidence that resulted from the search;[5] rather, it merely reiterated the unremarkable proposition that a defendant can challenge the constitutionality of his own seizure. The *Brendlin* Court expressly noted that it was not deciding the issue of whether the fact that the defendant was unlawfully detained gave him standing to challenge the search of the car he was riding in.[6] As a result, the Court concludes that Defendant Rivera has standing to challenge his seizure, but not the searches of the pickup, as he has failed to establish that without his detention the evidence seized would not have been discovered.

**Summers' Initial Questioning**

"A traffic stop is a 'seizure' within the meaning of the Fourth Amendment,"[7] and, as a consequence, is subject to the amendment's reasonableness requirement. "The reasonableness of a traffic stop depends on both the length of the detention and the manner in which it is carried out."[8] "An officer's inquiries into matters unrelated to the justification for the traffic stop, [the Supreme] Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."[9] Additionally, an officer's questions about a person's travel plans do not make the stop unreasonable because such questions are considered to be within the scope of the stop.[10] Here, Defendants contend that Trooper

---

[5] *See, e.g., United States v. Zavala*, 195 Fed. Appx. 746, 750 (10th Cir. 2006) (citing *DeLuca*, 269 F.3d at 1131). Stated another way, the defendant's detention must be the "but for" cause for the discovery of the incriminating evidence. *See Zavala*, 195 Fed. Appx. at 750.

[6] *Brendlin v. California*, 551 U.S. 249, 263 (2007). Even if *Brendlin* did alter this Circuit's fourth amendment standing doctrine, the result in this case would be unaffected for the reasons stated below.

[7] *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005).

[8] *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1258 (10th Cir. 2006) (internal quotation marks omitted).

[9] *Arizona v. Johnson*, - - - U.S. - - - -, 129 S. Ct. 781, 788 (2009); *see also Alcaraz-Arellano*, 441 F.3d at 1259.

[10] *See, e.g., United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001).

Summers' initial questioning was infirm because it measurably extended the duration of the detention and was unrelated to the purpose of the stop.

The Court finds Defendants' argument meritless. To begin with, Trooper Summers' initial questioning extended the duration of the stop, at most, by two and a half minutes, a de minimus amount of time.[11] Furthermore, the questions Trooper Summers asked the defendants before writing the driver a citation were related to the defendants' travel plans and ownership of the pickup.[12] Thus, Summers did not exceed the scope of the traffic stop. Therefore, Trooper Summers' actions leading up to the issuance of the ticket to the driver cannot serve as the basis for excluding the Government's evidence.

**Continued Detainment After Giving The Driver His Ticket**

Once the purpose for effectuating a traffic stop has been exhausted, an officer must allow the driver and his passenger to proceed on their journey "unless the officer has reasonable articulable suspicion of other crimes or the driver voluntarily consents to further questioning."[13] In their briefing, Defendants claim that Trooper Summers lacked either of the afore stated basis for detaining them once he had issued Defendant Hernandez-Lizardi his ticket. For the reasons stated below, the Court disagrees.

---

[11]*See United States v. Chaney*, 584 F.3d 20, 26 (1st Cir. 2009) (finding that a "delay of approximately two minutes" for unrelated questioning was "de minimus" and "did not measurably extend the duration of the stop"); *United States v. Derverger*, 337 Fed. Appx. 34, 36 (2d Cir. 2009) (concluding that five minutes of questioning unrelated to the justification for the traffic stop did not significantly extend the time that the defendant was detained). Defendants correctly do not claim that the seven minutes Trooper Summers took to run the defendants' information made the stop unreasonable in duration. *See, e.g., United States v. Rivera*, 570 F.3d 1009, 1014 (8th Cir. 2009).

[12]*See, e.g., United States v. Bradford*, 423 F.3d 1149, 1156-57 (10th Cir. 2005).

[13]*United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996).

First, the Court finds that Trooper Summers had reasonable suspicion to believe that criminal activity was afoot. Reasonable articulable suspicion is a "particularized and objective basis for suspecting the person stopped of criminal activity."[14] At the time he gave Defendant Hernandez-Lizardi his ticket, Trooper Summers knew, among other things, the following: (1) Lizardi was driving the pickup with a dealer's tag even though he claimed he to be the owner of the vehicle; (2) the vehicle had at least three cell phones;[15] (3) the bill of sale stated that Lizardi had bought the 2003 Chevy Silverado extended cab for $1,000, which was not a credible purchase price for that vehicle; (4) Lizardi claimed to live in California, but the bill of sale stated that he lived in Kansas City;[16] (5) Rivera's failure to make eye contact;[17] and (6) Defendant Lizardi's stated travel plans, that he and the passenger were headed to Denver to repair a car for a friend, that once the repair was done he was going to take the passenger back to Kansas City and then return home to California, were bizarre.[18] Viewing this information as a whole, the Court concludes that Trooper Summer had reasonable suspicion to detain the defendants for further questioning. Thus, the stop is justified on this ground.

---

[14] *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (internal quotation marks omitted).

[15] *See, e.g., United States v. Lopez-Gutierrez*, 334 Fed. Appx. 880, 883 (10th Cir. 2009) (stating that the fact that "[t]here were more cell phones in the car than passengers" supported a finding of reasonable suspicion); *United States v. Arana-Duarte*, 244 Fed. Appx. 121, 122 (9th Cir. 2007) (same).

[16] *See United States v. Karam*, 496 F.3d 1157, 1164 (10th Cir. 2007) (stating that statements that an officer reasonably interprets as a lie support a finding of reasonable suspicion); *cf. United States v. Ledesma*, 447 F.3d 1307, 1318 (10th Cir. 2006) (noting that the inconsistency between a small amount of luggage and the defendants' stated travel plans is a factor in a reasonable suspicion analysis).

[17] *See, e.g., United States v. Branch*, 537 F.3d 328, 338 (4th Cir. 2008).

[18] *See United States v. Kopp*, 45 F.3d 1450, 1453-54 (10th Cir. 1995) (finding that the defendants' statement that they were traveling from California to North Carolina to deliver a dilapidated couch supported a finding of reasonable suspicion).

The Court also concludes that the encounter is justified on the ground that it was consensual. "A detention for a traffic citation can turn into a consensual encounter after the trooper has returned the driver his documentation so long as 'a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information.' "[19] In determining whether a reasonable person would believe they were free to leave, courts focus on whether the officer had returned to the driver his license and registration before asking more questions and whether the officer had used an overbearing show of authority, such as displaying his firearm, physically touching or threatening the suspect, leaning on the suspect's vehicle, or using a commanding tone of voice, in the time leading up to the additional questioning.[20] In this case, Defendants argue that the encounter was not consensual because Trooper Summers used a commanding voice when he reapproached the vehicle, and, by not moving very far away from the pickup when he made his way back to his cruiser, he was effectively leaning on the vehicle.

Both of Defendants' arguments fail. First, the Court has viewed the recording of the stop and has concluded that at no time did Trooper Summers use a commanding tone. Second, to the extent that Defendants base their commanding tone argument on the fact that Trooper Summers immediately began asking them questions after reinitiating contact, as opposed to asking if they minded answering some additional questions, the argument fails as a matter of law. It is well-established that officers can immediately start asking questions after breaking initial contact, even if that break is only for a matter of seconds, without informing the suspect that he does not have to

---

[19]*United States v. Wallace*, 429 F.3d 969, 974-75 (10th Cir. 2005) (quoting *United States v. Elliott*, 107 F.3d 810, 814 (10th Cir. 1997)) (citation omitted).

[20]*United States v. West*, 349 Fed. Appx. 339, 340-41 (10th Cir. 2009).

respond to his questioning or that he is free to leave.[21]  Third, the fact that Trooper Summers remained close to the vehicle as he started back to his cruiser is not equivalent to him leaning on Defendant Lizardi's pickup.  As noted by the Tenth Circuit, the fact that a trooper remains close to a vehicle on I-70 is most likely the consequence of their desire to avoid being hit by traffic on a busy interstate, as opposed to attempting to exert some form of coercive authority.[22]  Accordingly, the Court concludes that the continued interaction between the parties was also consensual.

**Quick Search On The Roadside**

Defendant Lizardi next argues that his consent to a quick search of the pickup was not voluntary. "Voluntariness is a question of fact to be determined from all the circumstances."[23] "The government bears the burden of showing the consent was voluntary.  To meet its burden, the government (1) must proffer clear and positive testimony that consent was unequivocal and specific and freely given and (2) prove that this consent was given without implied or express duress or coercion."[24]

The Government has met its burden.  The video recording of the stop reveals that Summers' "manner and tone of voice when seeking permission to search was pleasant, not intimidating."[25] Furthermore, the recording and testimony from the hearing, show that, despite the fact that Summers did not inform Lizardi that he could decline the search, and the fact that Lizardi is a native Spanish

---

[21] *See, e.g., United States v. Velazquez*, 349 Fed. Appx. 339, 342 (10th Cir. 2009); *United States v. Ledesma*, 447 F.3d 1307, 1315 (10th Cir. 2006); *United States v. West*, 219 F.3d 1171, 1176-77 (10th Cir. 2000).

[22] *See West*, 219 F.3d at 1177.

[23] *Ledesma*, 447 F.3d at 1314.

[24] *United States v. Lyons*, 510 F.3d 1225, 1239 (10th Cir. 2007).

[25] *Id.*

speaker, Lizardi understood Summers' request and freely granted his consent to search. As a result, Summers was justified in extending the duration of the encounter and searching the pickup on the roadside.[26]

**Transportation Of Defendants To The Trooper Station**

Defendants contend that their transportation to the trooper station constituted an unlawful detention, as the event constituted a de facto arrest and Summers lacked the requisite probable cause. The Court disagrees. Recently, in *United States v. White*[27], the Tenth Circuit addressed the issue presented here. In *White*, the defendants were pulled over for committing a traffic violation. During the stop, the trooper developed reasonable suspicion that the defendants were engaged in drug trafficking, and, thus, directed the driver and to follow him to a Kansas Department of Transportation ("KDOT") office eight or nine miles down the road so that a canine unit could perform a sniff on the car, which the driver did. The canine sniff resulted to the discovery of drugs in the vehicle.[28]

Before trial, the defendants moved to suppress the drugs that were seized on the ground that their fourth amendment rights had been violated, as a de facto arrest had occurred when the trooper directed the driver to drive to the KDOT office. The trial court denied the motion. On appeal, the Tenth Circuit affirmed, finding that the officer's actions were not "highly intrusive," and, thus, were not tantamount to an arrest. In coming to this conclusion, the Court noted the fact that the trooper could have detained the vehicle's occupants, at least for a reasonable time, until a canine unit could

---

[26]*See, e.g., United States v. Rivera*, 570 F.3d 1009, 1014 (8th Cir. 2009) (stating that "[w]hen a motorist gives consent to search his vehicle, he necessarily consents to an extension of the traffic stop while the search is conducted").

[27]584 F.3d 935 (10th Cir. 2009).

[28]*Id.* at 941-43.

arrive, that the purpose of moving the defendants was to get the defendants on their way quicker, that the distance of the move was negligible, that the trooper communicated to the defendants that they would be free to go once the sniff occurred, the trooper had returned to the occupants their documents before making his request, and the trooper never raised the stakes by employing coercive tactics.[29]

The Court finds the facts of *White* to be sufficiently analogous to the facts here to control. Like the move in *White*, the move here allowed the responding trooper to expedite the process of confirming or dispelling his suspicions. By moving the defendants and the vehicle to the trooper station, law enforcement was able to question the defendants, perform a canine sniff, and search the vehicle all at roughly the same time. Furthermore, at the time Trooper Summers made his request, he had already returned the defendants' documents to them. Additionally, Trooper Summers did not employ any coercive tactics, e.g., placing the defendants in his cruiser, handcuffing them, pointing his firearm at them, during the stop. Lastly, Trooper Summers informed the defendants that they would be free to go once they had spoken to Trooper Rule about the money. Thus, in light of these facts, and the fact that roughly only forty minutes elapsed from the time of the initial stop to the time Rule began questioning the defendants and the officers performed their duties in a diligent manner,[30] the Court finds that the transportation of the defendants to the trooper station was not so intrusive as to be tantamount to an arrest. Therefore, the evidence against Defendants should not be suppressed on this ground.

---

[29]*Id*. at 954-55.

[30]*Cf. United States v. Cervine*, 347 F.3d 865, 872-73 (10th Cir. 2003) (upholding stop where the stop leading up to the canine investigation lasted approximately fifty minutes).

**The Search Of The Pickup At The Station**

Defendant Lizardi contends that the fruits of the search of the pickup at the station, i.e., the firearms and ammunition, must be suppressed because the search was neither consensual nor supported by probable cause. Because the Court finds that the subsequent search was supported by probable cause, it rejects Defendant's argument without addressing the question of whether the search was consensual.

In determining whether probable cause exists, "[t]he ultimate question is whether the facts and circumstances within the officer's knowledge . . . are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."[31] As stated above, at the time Trooper Summers told the defendants that he had a few more questions, reasonable suspicion existed. This reasonable suspicion graduated into probable once the following occurred: (1) Defendant Lizardi admitted that he had a large of amount of cash in vehicle, after previously denying that he did not;[32] (2) Lizardi did not know how much cash he had;[33] and (3) Lizardi retrieved a large amount of cash that was rubber banded together.[34] At the point these facts came to light, the Court finds that Trooper Summers had probable cause to perform a complete search of the vehicle.

The fact that a complete search of the vehicle was not performed until it was at the trooper station is of no consequence. It is well established that once a trooper has probable cause to search

---

[31]*Ledesma*, 447 F.3d at 1316.

[32]*See, e.g., United States v. Pratt*, 104 Fed. Appx. 135, 138 (9th Cir. 2004).

[33]Although Lizardi stated that he had about $20,000 in the pickup, a later accounting revealed that he had only $14,400.

[34]*See United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006) (finding that a large amount of cash is relevant to the probable cause inquiry).

a vehicle, the vehicle can be searched at a different location.[35] Therefore, for the foregoing reasons, the Court denies Defendant's motion to suppress on the ground that the search that occurred at the trooper station was unlawful.

**Questioning By Trooper Rule**

While Defendants do not explicitly claim that Trooper Rule's questioning was infirm because Rule failed to read them their Miranda rights, it appears they are not nevertheless presenting such a challenge. It is well established that Miranda warnings are required only when law enforcement officials conduct a custodial interrogation.[36] A suspect is considered to be in custody only when his freedom is "curtailed to a degree associated with formal arrest."[37] Therefore, using an objective analysis, the Court must "determine whether a reasonable person in the suspect's situation would have understood the situation as the functional equivalent of formal arrest."[38]

Applying the above analysis here, the Court concludes that the defendants were not in custody at the time they were questioned by Trooper Rule. Before he even spoke with either of the defendants, Trooper Rule informed them that they were not under arrest and that they were free to leave.[39] Furthermore, defendants were allowed to drive their own vehicle to the station, were never put under arrest, and were told that they would be free to go once they spoke to Trooper Rule. In light of these facts, the Court has little trouble concluding that the defendants were not in custody, and, thus, Miranda warnings were not required.

---

[35] *See, e.g., United States v. Lopez*, 777 F.2d 543, 550 (10th Cir. 1985).

[36] *See, e.g., United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008).

[37] *Id.*

[38] *Id.*

[39] *See United States v. Lester*, 285 Fed. Appx. 542, 547 (10th Cir. 2008).

**IT IS THEREFORE ORDERED** that Defendant Hernandez-Lizardi's Motion to Join Defendant Manazarez-Rivera's Motion to Suppress Evidence (Doc. 37) is GRANTED.

**IT IS SO ORDERED** that Defendant Hernandez-Lizardi's Motion to Suppress (Doc. 30) is DENIED.

**IT IS SO ORDERED** that Defendant Manzanarez-Rivera's Motion to Suppress Evidence (Doc. 35) is DENIED.

**IT IS SO ORDERED.**

Dated this 19th day of January, 2011.

*Eric F. Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE